IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.     No. 1:19-CR-003112-WJ-1

JACQUAN ABE,

    Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** comes before the Court upon Defendant's Motion to Suppress Identification and Statement (Doc. 69). Having reviewed the parties' pleadings and the applicable law, a hearing having been held and evidence having been taken and considered, this Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## BACKGROUND

Defendant is charged in connection with a series of events that occurred on August 6, 2019. Upon responding to a call for service, Albuquerque Police Department Officer Robert Sanchez spoke with witness G.R., who stated that the perpetrator approached him outside of the automotive shop where he works. He relayed, and surveillance footage confirmed, that the perpetrator attacked G.R. with a razor blade. G.R had been carrying a pistol which fell to the ground during this attack. The perpetrator picked up the pistol and attempted to shoot G.R. three times, however the gun never fired because the safety was engaged. G.R. described the perpetrator as a black male in his late 20s weighing 270 pounds and between 6'2" and 6'3".

Another witness, R.A, called 911 after she was robbed on the same day. She was working when the perpetrator came inside her place of business and robbed her at gun point. She stated on the 911 call that the perpetrator was wearing a sweater and shorts. When officers arrived, she stated the perpetrator was a tall, heavyset, black male adult wearing a hoodie. She described him as having a short, curly afro.

Officers then spoke with P.C., who worked in the building next to R.A. Someone came into his store and told him that there was a robbery in progress next door. He carried a pistol and went outside where he saw the perpetrator exiting the other business. P.C. approached the perpetrator with his own firearm. He put the pistol on the perpetrator's chest, telling him not to move, at which point the perpetrator dropped his gun and razor blade. The perpetrator then fled. P.C. described him as a 5'7" or 5'8" brown-eyed African American man with short, curly hair wearing a blue Highland High School hoodie and blue sweatpants.

Detective Ian Melville of the Albuquerque Police Department took over responsibility for this case and constructed a lineup for each of the above-mentioned witnesses. The lineup consisted of 5 photographs, including the Defendant's. He used a software program to randomize the photographs and Defendant's photograph was randomly placed in the first spot. Each witness viewed all five photographs at the same time, as opposed to being shown one photograph at a time.

G.R. was the first witness to view the photographic lineup. Before viewing the lineup, Detective Melville stated, "Do your best to point him out, if you can." He then read G.R. standard warnings informing him that the person he saw may or may not be in the lineup, that he should not feel obligated to identify anyone in the lineup, and to keep in mind that small features

may change and lighting differences can make the person appear lighter or darker than normal. G.R. identified the Defendant in the lineup without hesitation.

At separate times, R.A. and P.C. were read the same warnings and shown the same lineup. After debating between two photographs, they both identified the Defendant.

An arrest warrant was issued for Defendant on state charges for first degree murder, aggravated battery with a deadly weapon, assault with intent to commit a violent felony, and robbery with a deadly weapon. He was taken to and incarcerated in a state facility. The state case was dismissed six days after being filed and a federal complaint was issued. It charged Defendant with felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1), brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. 924(c)(1)(A)(ii), and robbery by force, violence or fear, in violation of 18 U.S.C. 1951.

FBI Agent Leysha Lopez Recci arrested Defendant at the state facility and transported him to a federal facility along with a state officer. On the drive to the federal facility, Agent Recci asked Defendant questions regarding his name, age, height, address, and date birth. She told him this information was for booking purposes to provide to the marshals when they arrived at the federal facility. She then continued questioning him about the specifics of the incident in question.

## DISCUSSION

I.   **The Photo Array**

Defendant argues that the photographic lineup violated his due process rights. A two-part test is used to determine whether admission of a photographic lineup violates a defendant's due process rights. *United States v. Sanchez*, 24 F.3d 1259, 1261 (10th Cir. 1994). "First, the court must determine whether the photo array was impermissibly suggestive, and if it is found to be so,

then the court must decide whether the identifications were nonetheless reliable in view of the totality of the circumstances." *Id*. at 1261-62.

      a.  <u>Whether the Photo Array was Impermissibly Suggestive</u>

The size of the array, manner of its presentation by officers, and details of the photographs are all relevant considerations when determining whether a photo array is impermissibly suggestive. *Sanchez,* 24 F.3d at 1261-62.

    i.  *Size of the Array*

As it pertains to the size of the array, the number of photographs is not itself a substantive factor, but instead merely affects the weight given to other alleged irregularities. *Id*. at 1262. "The larger the number of pictures used in an array, the less likely it is that a minor difference, such as background color texture, will have a prejudicial effect on selection . . . Conversely, when a relatively low number of photographs are used in an array, minor differences such as background color can make a picture stand out." *Id*. In the case at hand, the photo array had 5 photos, which is small. See *id*. ("Common sense dictates that slight irregularities are more likely to 'jump out' at a witness reviewing a single sheet of paper with only six photographs."); *United States v. Wonku*, 800 F.3d 1195, 1203 (10th Cir. 2015) ("In six-photograph arrays, significant weight is given to irregularities) (citing *United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999, overturned on other grounds). Therefore, the other factors will be more scrutinized.

    ii.  *Manner of Presentation*

The next factor to be considered by the Court is the manner of presentation of the photo array by the officers. Defendant asserts that Officer Melville failed to inform each witness that they should not pay attention to the numbers on the photographs, should disregard any differences in the type or style of the photographs, and that the police would continue to

4

investigate the case regardless of the selection. Defendant further points out that his photo was placed first in each array, that the folder shuffle method was not used, and that the array was not administered blindly—all of which are required by current internal procedures. The folder shuffle method means the witness is given one photograph at a time, rather than looking at all five photographs at once. Blind administration means the officer presenting the array is not the same as the one investigating the case. The Government contends that a random order generator was used and Defendant happened to be placed first in the photo array. It also asserts that the Internal Procedures outlining policies for photo arrays have been changed since the conduction of this array and, at the time, the array complied with the policies.

As Defendant points out, failing to follow internal protocols can be a factor in determining whether the array was impermissible suggestive. *United States v. Saunders*, 501 F.3d 384, 391 (2007) (relying in part on the fact that the officer failed to follow protocol by telling a witness that a suspect had been arrested); *see also United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999), *overturned on other grounds*, (finding that it was improper to alert a witness that an arrest had been made); *United States v. Smith*, 156 F.3d 1046, 1050 (1998) (10th Cir.) (alerting witnesses that an individual was a suspect was improper). However, though the internal procedures have since been updated, at the time of the photo array, the array complied with those rules. Now, being placed first in the photo array is not recommended, however at the time, there was no rule or policy indicating that the officer should re-generate the array when the random order generator placed Defendant first. Similarly, the policies at the time did not instruct the officer to use the folder shuffle method. Thus, the Court finds that these factors weigh against suppression.

The main issue is Officer Melville's manner of presentation to G.R., to whom he stated, "Do your best to point him out, if you can." Officer Melville did not make any similar statements to the other two witnesses, so the Court finds that the manner of presentation to them was proper. Defendant argues this statement to G.R. inappropriately implied that the perpetrator was in fact present in the lineup. The Government asserts that the weight of this statement was reduced by the fact that it was said several minutes prior to the lineup presentation and that Officer Melville also read G.R. the standard warnings that the perpetrator might not be in the lineup. Defendant countered that this statement was a bell than cannot be un-rung. The Court agrees that this statement tainted the presentation to G.R.

In sum, this factor weighs against suppression as it pertains to R.A. and P.C., but slightly in favor of suppression as it pertains to G.R. given Officer Melville's statement.

      *iii.*    *Details of Photographs*

The final factor to be assessed is the details of the photographs. Defendant asserts that his picture stands out because his face appears larger than the others, he is framed differently and the top of his head is cut off, he appears to be leaning into the camera while the others are not, he appears agitated while the others do not, his photo is brighter, he appears younger, and he is the only one with curly hair as described by the witnesses. He points out that the other individuals are of varying ages—one is over three years younger than Defendant and two are three and six years older respectively. The Government argues that each of the individuals have different features and slightly different lighting, but nothing sets Defendant's out from the group. It argues that each of the men are of a similar weight, height, and age and portray similar expressions. They are all dressed in jumpsuits in front of a light-colored brick wall. It also asserts that Officer Melville did not have the ability to enhance Defendant's photograph.

The threshold question is whether Defendant's photo was "strikingly different" from the others or merely slightly different. *Compare Saunders*, 501 F.3d at 390-391 (noting the stark contrast of the light background in Defendant's photo with the dark backgrounds of the others and that Defendant had a menacing countenance that the others did not); *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (finding that noticeably different facial expressions and characteristics rendered array impermissible); *with United States v. Worku*, 800 F.3d 1195, 1204 (10th Cir. 2015) (concluding that while the lighting was slightly different, the array was not impermissible because all were color photographs and depicted Ethiopian men of similar ages); *United States v. Sanchez*, 24 F.3d 1259, 1263 (10th Cir. 1994) (upholding array because despite some irregularities, each person was very similar in physical appearance); *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994) (concluding that Defendant's photo was slightly brighter and slightly more close up than the others, but each depicted a color photo of men roughly the same age in a frontal mug shot).

As it pertains to the lighting of the pictures, Defendant's picture is the lightest. He is slightly lighter than photos 2 and 3 and much lighter than photos 4 and 5. His photo is also the closest up of all the photos and the top of his hair is cut off. He has curlier hair than the others, but individuals #2, #3, and #4 also have varying levels of curls. The Court does not perceive that Defendant appears younger, heavier, or lighter or darker skinned than any of the other photos. Moreover, he and individual #3 portray a sad expression while individuals #2 and #4 seem angry and individual #5 seems indifferent, which is overall an acceptable assortment of expressions. While there are some minor differences in lighting and angles in the photographs, the Court does not find that these differences render Defendant's photograph "strikingly different" from the others. Therefore, this factor weighs against suppression.

In conclusion, as it pertains to R.A. and P.C., while the size of the array weighs slightly in favor of suppression, analysis of the other two factors demonstrate that the array was not impermissibly suggestive. Thus, the Court's inquiry into the admissibility of their identifications stops here. As it pertains to G.R., the size of the array and the manner of presentation weigh slightly in favor of suppression, but the details of the photographs weigh against suppression. However, even if the presentation to G.R. was impermissibly suggestive, his identification was otherwise reliable as the following section will demonstrate.

      b.   Whether G.R.'s Identification was Reliable

If the array was impermissibly suggestive, the court must determine whether a witness's identification was nevertheless reliable. The Court will consider 1) the witness's opportunity to view the perpetrator at the time of the crime; 2) the witness's degree of attention at the time of the offense; 3) the accuracy of the witness' prior description of the perpetrator; 4) the witness's level of certainty when identifying the defendant as the perpetrator at the time of the confrontation; and 5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Any concerns that can be addressed on cross-examination weigh against prohibiting witnesses to identify those that they observed commit a crime. *Id*. at 198.

In this instance, Defendant argues that G.R.'s ability to focus on the perpetrator was hindered by fear due to the presence of a gun. Defendant cites *United States v. Greene* for the proposition that the presence of a gun and the stress of a situation can diminish a witness's ability to recall and make an accurate identification. 704 F.3d 298 (2002). He argues that G.R. interacted briefly with the perpetrator and gave a generic description of him. He also asserts that G.R. is not the same race as the perpetrator and cross-racial identifications can be problematic. *See generally Perry v. New Hampshire*, 565 U.S. 228 (2012). The Government counters that a crime victim has

8

a particular incentive to form a reliable recollection of an offender. *See generally United State v. Saunders*, 501 F.3d 384 (4th Cir. 2007).

This case is distinguishable from the facts in *Greene*. 704 F.3d at 308. In that case, the Court applied the *Biggers* factors and determined the witness's identification was unreliable because the perpetrator was wearing a long wig and sunglasses, the witness immediately hid under counter when she realized a robbery was occurring, the witness gave different heights for the perpetrator, and the identification occurred seventeen months after the robbery. Indeed, it noted that the witness had a gun pointed in her face twice, which diminished the reliability of her identification, however this was just one factor of many.

Contrarily, in the case at hand, G.R. observed the perpetrator outside in the broad daylight. The perpetrator's face and head were not obscured. He was within striking distance of G.R. As such, G.R. gave a detailed description of the perpetrator, stating he was a large black male in his late twenties between 250 and 270 lbs. and between 6'0 and 6'3. While he was off the mark on the weight and age, he otherwise relayed reasonable accurate information. He also provided a detailed account of the incident which was corroborated by surveillance video. G.R. also interacted with the perpetrator during the assault before any weapons were introduced. Moreover, at the lineup, G.R. did not hesitate in making his identification and confidently stated that suspect #1 was the perpetrator. Finally, the length of time in between the incident and the identification was short, as there was only a gap of two days. Overall, while the Court acknowledges that cross-racial identifications can be problematic, G.R.'s identification of the Defendant was reliable.

Therefore, the Defendant's request to suppress the witness' identifications is hereby **DENIED**.

## II.     The Interrogation

Defendant argues that his statements made to FBI Agent Recci should be suppressed because he was not informed about his right to counsel while being questioned on the drive to the federal facility. He argues that the statements should be suppressed based on a violation of both his Fifth and Sixth Amendment rights. Because the Court finds that Defendant's Fifth Amendment right was violated, it will not address the parties' arguments pertaining to the Sixth Amendment.

The only warnings the FBI agent made to Defendant that even resembled *Miranda* warnings consisted of the following: "We are on our way to the courthouse. We will take you to the marshal, and then you will see a judge, and then the judge will basically explain to you what your rights are. And you know, they'll make you out a form to see if you qualify for like a free attorney. You don't have to pay . . . They'll appoint you an attorney, you'll have a chance to talk to an attorney and you'll come back to court tomorrow and that attorney will speak to you. So, you do know your rights." When asked at the hearing whether the agent read Defendant his rights, she testified, "Yes. I tried reading him his rights. I was driving." The Government concedes that this is a defective *Miranda* warning, and the Court is in complete agreement regarding the insufficient manner of informing Defendant of his constitutional rights.

Nevertheless, the Government relies on the routine booking exception in its attempt to seek the introduction of Defendant's statements made regarding his name, age, height, address, and date birth. Questions regarding "biographical data necessary to complete booking or pre-trial services" are routine booking questions exempted from the requirements of *Miranda*. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). However, the booking exception does not apply when a law enforcement officer asks questions under the guise of booking a suspect,

intending to elicit incrimination information. *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993) (citing *Muniz,* 496 U.S. at 602 ("The police may not ask questions, even during booking, that are designed to elicit incriminating admissions.")). In other words, the test is an objective one asking whether the questioning under the circumstances was reasonably likely to elicit incriminating information relevant to establishing an essential element of the crime charged. *Id*. (citing *United States v. Equihua-Juarez*, 851 F.2d 1222, 1227 (9th Cir. 1988)); *United States v. Sanchez,* 817 F.3d 38, 45 (1st Cir. 2016). The officer's actual belief or intent in asking the questions is relevant, but it is not conclusive. *Sanchez,* 817 F.3d at 48. This exemption exists because ordinarily, routine booking questions do not elicit incriminating responses and thus are not considered interrogation. However, when such questions are designed to elicit incriminating information, the rationale behind applying the exception does not hold. *See Parra*, 2 F.3d at 1068.

      Agent Recci testified, and the audio exhibit seems to confirm, that Defendant's biographical information was elicited while the agent was filling out a booking form to provide to the marshals. However, Agent Recci admitted that she wrote Defendant's criminal complaint. She therefore knew the necessary facts of the case and how they related to his charges. As the case agent, she knew that identity was a contested issue in his case. She testified that she already knew the general area where Defendant lived, which is important to the case as he lived directly behind where the crime occurred and in the school district of Highland High School, a school name depicted on the hoodie that surveillance footage showed the perpetrator wearing. She asked him numerous times throughout the interview where he lived. She asked about his high school as well.

When asked whether the purpose of asking him the booking questions was to fill out the required form for the marshals, she responded, "mainly," which implies the possibility of another motive. Indeed, because she was the case agent, she had a stake in gathering incriminating information on Defendant—a stake that would be absent had neutral marshals at the facility been conducting the intake. In fact, Defense counsel admitted that she would not have taken issue with this questioning had the marshals rather than the case agent been the ones asking questions. In that circumstance, the marshals' motive would have been entirely different than the case agent's, and the circumstances would have been such that the marshals would not have "reasonably expected the questions to elicit an incriminating response." The circumstances of Agent Recci's questioning is a different story. She even admitted that the nature of Defendant's answers to the booking questions caused him to reveal incriminating information—which was foreseeable given the identity issues in the case. She testified, "Given the nature of his answers to booking questions, he started to essentially spill into what could be relevant to the case so, and I was driving, so I tried to really explain to him what's going on, to let him know that anything he could say could be used against him." However, her insufficient attempt to provide Miranda warning occurred over 15 minutes into the questioning. While the Government argues that the first fifteen minutes were merely an attempt to fill out a booking form for the marshals, the questioning continues and is clearly intended to gather incriminating information. Agent Recci asks him about his school, his younger brother, how long he had been out in society after being released from incarceration on a prior charge, the process of turning himself in, the dynamics of his family situation and where and from whom he obtained money. She then asks many specific details about the incident in question. It is therefore impossible to distinguish which questions were merely for the purpose of booking and which were for the purpose of interrogation; and it is

more relevant that regardless of Agent Recci's intent behind each question, they all were reasonably likely to elicit incriminating information given her intimate knowledge of the case and the fact that identity was a central issue in the case.

The Court notes that under these circumstances, Agent Recci or the other officer present could have easily provided Defendant with proper *Miranda* warnings immediately upon apprehending him to transport him to the federal facility. Relying on the fact that she was driving is an inadequate excuse for impinging on his constitutional rights. If the agent could interrogate Defendant while driving, she should have been able to advise him of his basic *Miranda* rights while driving, or the other officer in the car could have informed the Defendant of his *Miranda* rights. Because the questions asked were reasonably expected to elicit an incriminating response, Defendant's request to suppress the statements is **GRANTED**.

In conclusion, the Defendant's request to suppress the witness' identifications is **DENIED**. The request to suppress the Defendant's statements about his biographical information is **GRANTED**.

**IT IS SO ORDERED.**

WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE